The **FIDELITY BANK**

v.

**COMMONWEALTH MARINE AND GENERAL ASSURANCE COMPANY, LTD; J.E. Mamiye & Sons, Inc.; Maurice L. Jackson; Floyd Fountain and Farmers State Bank of Center, Texas; George K. Lynch; Horizon Medical Administrators, Inc.; G.A. Brown; Pak-Mor Manufacturing Company; Delan Townson and First Alabama Bank of Conecuh County; Phillips & Son, Inc.; Hutchinson Financial Corporation of Alabama; Neb, Ltd.; Anne and Art Johnston d/b/a Treasure Harbor Sailing Yachts; and Reid, Inc.**

**Civ. A. No. 83–2071.**

United States District Court, E.D. Pennsylvania.

Aug. 7, 1984.

Joan A. Yue, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for The Fidelity Bank.

Gordon Gelfond, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., for Com. Marine & General Assur. Co., Ltd.

Miles H. Shore, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for J.E. Mamiye & Sons, Inc.

Eileen P. Epley, Philadelphia, Pa., for Maurice L. Jackson.

T.R. McLeroy, Jr., Center, Tex., for Floyd Fountain and Farmers State Bank of Center, Texas.

Glenn E. Woodard, El Paso, Tex., for George K. Lynch.

Stephen D. Ivey, Philadelphia, Pa., for G.A. Brown.

Joseph H. Reiter, Stephen M. Chiles, Stassen, Kostos & Mason, P.C., Philadelphia, Pa., for Pak-Mor Mfg. Co.

William J. Barker, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Delan Townson d/b/a Townson Trucking Co., and First Alabama Bank of Conecuh County.

Brenda Smith Stedham, Merrill, Porch, Doster & Dillon, Anniston, Ala., for Hutchison Financial Corp. of Alabama.

John C. Sullivan, Lennon C. Wright, Esquire c/o John C. Sullivan, Frumkin & Manta, Philadelphia, Pa., for Phillips and Son, Inc.

Maurice J. Maley, Jr., Krusen Evans & Byrne, Philadelphia, Pa., for Anne & Art Johnston, d/b/a Treasure Harbor Sailing Yachts.

Arnold P. Borish, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, Pa., for Horizon Medical Administrators, Inc.

William J. Cattie, III, Heckler & Cattie, Wilmington, Del., for NEB, Ltd.

Neal L. Conner, Jr., Kopp, Peavy & Conner, P.C., Waycross, Ga., for Reid, Inc.

## OPINION

LOUIS H. POLLAK, District Judge.

The facts underlying this action, and certain preliminary legal analysis, appear in my earlier Opinion in this matter dated February 24, 1984. *Fidelity Bank v. Commonwealth Marine and General Assurance Company, Ltd.*, 581 F.Supp. 999 (E.D.Pa.1984). This Memorandum and the accompanying Order dispose of certain legal issues left unresolved by that earlier Opinion. In order to provide background for the discussion here, I repeat in abbreviated form some of the pertinent facts related at length in 581 F.Supp. at 1002–1011, together with some more recent developments.

Commonwealth Marine and General Assurance Company, Ltd. ("Commonwealth") sold insurance in the United States for some period preceding the inception of this action. Commonwealth, a Belize corporation, established a Trust Fund on deposit with The Fidelity Bank ("Fidelity") to provide security for Commonwealth's American policyholders.[1] Fidelity served as trustee. As of April 29, 1983, eight individuals and corporations had made claims against the fund which far exceeded the amount on deposit.[2] Fidelity, unsure which claimants to recognize, and in what order, commenced this action in interpleader on April 29, 1983, paying $440,891.61 into court. By February 24, 1984, fifteen individuals and corporations had asserted thirteen separate claims against the interpleaded fund. *See* 581 F.Supp. at 1005–1009 (describing thirteen claims).

The February 24 Opinion disposed of most of the issues raised by the various claimants' cross-motions for summary judgment. In that Opinion I concluded that four claimants would receive distributions from the interpleaded funds. Specifically, I held that Mamiye had validly attached all assets of Commonwealth (1) in the hands of Fidelity on the date of Mamiye's service of the writ of execution, May 28, 1982, or (2) coming into Fidelity's hands thereafter. However, I held that this attachment did not reach assets impressed with Commonwealth's trust because Mamiye was not a creditor entitled to payment under the Trust Agreement. Because principal, but no income, became part of the Trust, I held that Mamiye could recover the full amount of the interpleaded sum not impressed with Commonwealth's trust. *See Fidelity Bank*, 581 F.Supp. at 1013–1016. I further held that Mamiye's entitlement depended on the outcome of

---

1. The Trust Agreement which formed the trust in question appears as an appendix to the February 24 Opinion. *See* 581 F.Supp. at 1022–1029.

2. By April 29, 1983, J.E. Mamiye & Sons, Inc. ("Mamiye"), Horizon Medical Administrators ("Horizon"), and Pak-Mor Manufacturing Company ("Pak-Mor") had served writs of execution on Fidelity as garnishee under the Pennsylvania Rules of Civil Procedure governing attachment. *See* Pa.R.Civ.P. 3101–3149 (Purdon 1975 and Supp.1983). G.A. Brown ("Brown") had served two writs of execution on Fidelity. George K. Lynch ("Lynch"), Maurice L. Jackson ("Jackson"), Floyd Fountain ("Fountain"), Farmers State Bank Center, Texas ("Farmers"), Delan Townson ("Townson"), and First Alabama Bank of Conecuh County ("First Alabama") had each initiated the process of collecting from the Trust Fund under the terms of the Trust Agreement. This initiation involved notice to Fidelity that the claimant had obtained a judgment against Commonwealth. Brown and Horizon had also given Fidelity notice of their claims under the Trust Agreement in addition to serving writs of execution upon Fidelity.

pending proceedings in New York seeking to overturn Mamiye's judgment against Commonwealth. 581 F.Supp. at 1016–1017.[3]

I next held that Horizon and Brown had validly attached the Trust's assets before any other claimants had perfected a claim under the Trust Agreement and before any other attaching creditors. I therefore held that they had priority in payment of the Trust's assets, at least as to the amounts of the judgments underlying their writs of execution. Horizon has a New York judgment in the amount of $83,080. Brown has a Texas judgment in the amount of $117,-066.02. Horizon received $32,080 from the interpleaded fund on March 7, 1984, and $51,000 on March 14. Brown received $117,066.02 on March 14. On February 24, 1984, I further held that Pak-Mor would receive the remainder of the interpleaded fund after determination of all outstanding issues. This Opinion disposes of several of those issues.

*First*, Jackson has moved for reconsideration of my February 24 Opinion and the accompanying Order as applied to him. Disposition of this motion should precede disposition of other matters. *Second*, the February 24 Opinion specifically invited further submissions on the reserved question of whether this court could or must award interest to successful claimants out of the interpleaded fund. *See Fidelity Bank*, 581 F.Supp. at 1120–1121. *Third*, the Order accompanying the February 24 Opinion invited plaintiff to file further motions for summary judgment against those claimants not prevailing on their motions for summary judgment. That Order also invited plaintiff, Jackson, and Horizon to each move for summary judgment on Jackson and Horizon's counterclaims. Fidelity has petitioned for discharge as to all claimants. Fidelity has also moved for summary judgment on Horizon's counterclaim. Jackson has stipulated to dismissal of his counterclaim.

### 1. *Jackson's Motion for Reconsideration*

Each of the claimants to the interpleaded fund has obtained a judgment against Commonwealth in a court of a state other than Pennsylvania. The claimants attempted to induce Fidelity to satisfy these judgments out of Commonwealth's deposits in one of two ways. Mamiye, Horizon, Brown, and Pak-Mor entered their judgments in Pennsylvania courts of common pleas and then served Fidelity with writs of execution, thereby attaching the interpleaded funds. *See* Pa.R.Civ.P. 3101–3149 (Purdon's 1975 and Supp.1983). Other claimants attempted to follow the procedure delineated in the Trust Agreement.

The second paragraph of article II of the Trust Agreement provides:

A claim against the Company under an American policy issued subsequent to the execution of this trust agreement shall be enforceable by the policy-holder against the Trust Fund when all of the following four conditions have been complied with and not otherwise.

(A) A judgment has been obtained by the policyholder against the Company in any Court of competent jurisdiction within the United States of America in respect of the Company's liability under an American policy;

---

**3.** Mamiye has a default judgment entered in the Supreme Court of New York, New York County, Index No. 11909/82. Commonwealth moved to vacate that default and Pak-Mor moved to intervene. Stephen B. Schneer, Esq., Mamiye's New York counsel, filed an affidavit in this action averring, with appropriate exhibits, that Justice Rubin has denied Commonwealth's motion to vacate, *J.E. Mamiye & Sons, Inc. v. Commonwealth Marine & General Assurance Co., Ltd.*, Index No. 11909/82 (N.Y.Sup.Ct., N.Y.County, Feb. 8, 1984), and that Justice Cohen has denied Pak-Mor's motion to intervene, *J.E. Mamiye & Sons, Inc. v. Commonwealth Marine & General Assurance Co., Ltd.*, Index No. 11909/82 (N.Y. Sup.Ct., N.Y. County, Jan. 25, 1984).

Mamiye has not moved for summary judgment here on the basis of this result. Commonwealth or Pak-Mor may have appealed from the New York trial court's decisions. On this record, it is not yet clear that Mamiye is entitled to a recovery. As a material issue of fact still exists as to the amount of any recovery by Mamiye, such a decision may await further proceedings. This Opinion will therefore treat Mamiye's entitlement as contingent.

(B) Such judgment has become final in the sense that the particular litigation has been concluded either through the failure to appeal within the time permitted therefore or through the final disposition of any appeal or appeals that may be taken, the word "Appeal" being used herein to include any similar procedure for review permitted by the applicable law;

(C) A certified copy of the said judgment has been filed with the Trustee, together with such proof as to its finality and its conformance with the other conditions specified in this Article II as the Trustee shall require;

(D) A period of thirty (30) days from the date of the filing with the Trustee of the said certified copy of the said judgment and all of said proofs has expired, without such judgment having been satisfied, provided, however, that the expiration of such thirty-day period shall not be required in the event the same extends beyond the termination date of the Trust;

WHEREUPON the said judgment shall be forthwith satisfied by the Trustee out of the Trust Fund then in its hands, without regard to the rights of any other policyholder or policyholders provided that the Company at its option may waive any or all of the foregoing conditions mentioned in Subdivisions (A), (B), (C), and (D) hereof and direct the Trustee in writing to pay from the Trust Fund the claim of any policyholder against the Company under an American policy without such claim having become enforceable as above defined, whereupon the said claim shall be forthwith satisfied by the Trustee out of the Trust Fund then in its hands without regard to the rights of any other policyholder or policyholders and provided further that the Trustee shall be absolutely protected in acting upon any such written direction from the Company without investigation and shall be under no obligation to see to the application of any such payment and shall not be concerned to ascertain or inquire as to the validity of such claim or the propriety of such direction.

*Fidelity Bank*, 581 F.Supp. at 1024.

Under this paragraph's procedure, a claimant had two routes to obtaining payment from the Trust Fund. The claimant could obtain an order from Commonwealth directing Fidelity to pay the claimant. Commonwealth issued no such order. Alternatively, the claimant had to comply with four steps: he had to obtain a judgment, survive all appeals or the pertinent appeal period, certify the judgment's finality to Fidelity's satisfaction, and wait thirty days. *See Fidelity Bank*, 581 F.Supp. 1004–1005.

Relying on *Austin-Nichols & Co., Inc. v. Union Trust Co.*, 289 Pa. 341, 137 A. 461 (1927), *Smith v. Keener*, 270 Pa. 578, 113 A. 912 (1921), *Patten v. Wilson*, 34 Pa. 299 (1859), and *Cain v. Hockensmith Wheel & Car Co.*, 157 F. 992 (C.C.W.D.Pa.1907), on February 24 I held that "Pennsylvania law establishes a first-in-time, first-in-right priority rule as between an attaching creditor and a claimant with an equitable lien under the Trust Agreement. An attaching creditor cannot attach property which the garnishee must pay to one other than the creditor's debtor." *Fidelity Bank*, 581 F.Supp. at 1019. I applied this analysis to the facts of this case and held that a claimant did not obtain an equitable lien on the assets of Commonwealth's trust until that claimant had satisfied all four conditions of the second paragraph of article II; only then would "the said judgment ... be forthwith satisfied by the Trustee out of the Trust Fund then in its hands, without regard to the rights of any other policyholder or policyholders...." Trust Agreement, art. II, ¶ 2.

Pak-Mor filed its writ of execution April 19, 1983. Pak-Mor's claim exceeded the amount of the deposit then in Fidelity's hands. Thus, if Pak-Mor has priority over Jackson, Jackson cannot recover from the interpleaded fund.

Jackson attempted to perfect an equitable lien under the Trust Agreement. On April 19, 1983, Jackson had not yet com-

pleted the fourth of the four steps mandated by the second paragraph of article II; Jackson had certified the finality of his judgment to Fidelity's satisfactor on April 8, 1983, and had to wait until May 8, 1983, to obtain payment. Under my analysis of February 24, then, Pak-Mor had priority over Jackson because Jackson had not perfected an equitable lien on the Trust's assets by the time of Pak-Mor's April 19, 1983, attachment.

■ Jackson has moved for reconsideration. Jackson contends that he had perfected an equitable right to payment from the interpleaded fund as of the date that he had performed the last discretionary act prerequisite to his right to payment. Specifically, Jackson contends that he perfected his right to payment from the Trust Fund when he certified his judgment's finality to Fidelity's satisfaction. As of that date, Jackson contends, Fidelity had no further discretionary acts to perform and Jackson had no acts at all to perform. Both Jackson and Fidelity had only to await the expiration of thirty days, a period intended to permit Fidelity conveniently to liquidate the Trust's assets.

Jackson does not quarrel with the reasoning of the February 24 Opinion other than that leading to the conclusion that a claimant under the Trust Agreement obtains no right to payment ahead of an attaching creditor until the Trust Agreement claimant has satisfied all four steps of paragraph Second of article II. Jackson advances several theories under which he believes that he received an equitable right to payment upon satisfaction of the first three conditions in paragraph Second. Jackson contends that no decisions of the Pennsylvania courts squarely decide this question in a context like the present one; therefore, so Jackson argues, this court

should, as a matter of fairness, accord him priority over Pak-Mor.[4]

It is not self-evident that resolution of a case like this one can turn on a finding of an optimally "fair" result. This case involves a dispute among innocent parties as to who shall receive some of the assets of an absent party which has not paid its debts. Fairness has little to do with this distribution; in a perfectly "fair" world, Commonwealth Marine would be able to pay all of the claimants here. What is called for in this case is the identification of rules which will impartially and efficiently allocate insufficient assets among claimants, all of whom are presumptively worthy. The rules rest upon considerations of certainty and swift resolution of disputes quite as much as they do on considerations of "fairness."

In order properly to analyze Jackson's claim, it is essential to keep in mind that to prevail Jackson was not required to demonstrate some general equitable right to payment but rather an equitable right to payment *ahead of Pak-Mor*. Jackson had no such right.

On the date that Pak-Mor served its writ of execution upon Fidelity, Pak-Mor acquired all of Commonwealth's rights in the Trust Fund's assets. *Cf. Converse v. Hawse*, 326 Pa. 1, 190 A. 899 (1937); *Austin-Nichols & Co., Inc. v. Union Trust Co.*, 289 Pa. 341, 137 A. 461 (1927). On the date of Pak-Mor's attachment, Pak-Mor acquired Commonwealth's right "at its option [to] waive any or all of the conditions mentioned in Subdivisions (A), (B), (C), and (D) [of paragraph Second] and [to] direct the trustee in writing to pay from the Trust Fund the claim of any policyholder against the Company under an American policy without such claim having become enforceable as" defined in that paragraph. Trust Agreement art. II, ¶ 2. Upon receipt of the

4. Jackson also contends that the court ought not require compliance with all four conditions of paragraph Second because no party raised this argument. In fact, the parties gave only cursory treatment to the central issue of priority as between attaching creditors and claimants under the Trust Agreement. Out of hundreds of

pages of briefs filed on the cross-motions for summary judgment, fewer than five dealt with this question. But there is no compelling reason why this dearth of legal analysis should bind the court to adopt an incorrect or incomplete view of the law.

direction from Commonwealth, or Pak-Mor standing in Commonwealth's shoes, "the said claim shall be forthwith satisfied by the Trustee out of the Trust Fund then in its hands *without regard to the rights of any other policyholder....*" Id. (emphasis added). Pak-Mor's attachment, then, permitted Pak-Mor to obtain immediate payment from Fidelity without regard to any other claimant's rights. The service of the writ of execution operated as a written direction to Fidelity from Pak-Mor to pay Pak-Mor.

The Trust Agreement not only defines the rights that Pak-Mor acquired as against Fidelity, but it also defines the rights that Pak-Mor acquired against Jackson. "When a creditor makes use of attachment process, he thereby treats the contract by which the garnishee acquired possession of the fund in his hands as valid...." *Austin Nichols & Co.*, 289 Pa. at 346, 137 A. at 463. In this regard, *Vincent v. Watson*, 18 Pa. 96 (1851), proves particularly instructive. *See Fidelity Bank*, 581 F.Supp. at 1019. In *Vincent*, the court held that an attaching creditor could not receive payments ahead of certain other creditors of the attaching creditor's debtor. The debtor had agreed with the garnishee that the garnishee could pay certain debts of the debtor's business. A general creditor could only attach the debtor's rights subject to the debtor's contract with the garnishee.

The Trust Agreement grants a claimant under the procedure established by the second paragraph of article II an unconditional right to payment "when all of the following four conditions have been complied with and not otherwise." Trust Agreement art. II, ¶ 2. An attaching creditor would take subject to Fidelity's unconditional duty to pay the claim of a claimant who had satisfied all four of the conditions stated in paragraph Second. *Cf. Smith v. Keener*, 270 Pa. 578, 113 A. 912 (1921); *Patten v. Wilson*, 34 Pa. 299 (1859); *Vincent v. Watson*, 18 Pa. 96 (1851).

■ Jackson had no such unconditional right to payment. Without such a right

under the Trust Agreement, Jackson's equitable right to payment, if any, was insufficient to defeat the unconditional right to payment attached by Pak-Mor. *Cf. Cain v. Hockensmith Wheel & Car Co.*, 157 F. 992 (C.C.W.D.Pa.1907). Accordingly, Pak-Mor has priority in payment from the interpleaded fund over Jackson. The accompanying Order therefore denies Jackson's petition for reconsideration.

## 2. *Interest*

As discussed above, four claimants may have a right to recover from the interpleaded fund. Mamiye may recover an as yet undetermined amount if it survives proceedings challenging its New York judgment. Horizon has received payment of $83,080. Brown has received payment of $117,066.02. Pak-Mor will recover any portion of the interpleaded fund not paid to another claimant.

All four of these claimants seek to recover prejudgment interest from the interpleaded fund. This interest covers two periods. First, it covers the period from the time of the claimants' state court judgments until April 29, 1983, the date that Fidelity commenced this action. Second, it covers the period from April 29, 1983, until the date of payment from the interpleaded fund. In all four cases, any award of interest would have a dual quality. It would be *post*-state-judgment interest, but *pre*-federal-judgment interest.

■ State law determines whether this court should award prejudgment interest in an interpleader action. *See, e.g., Amoco Transport Co. v. Dietze, Inc.*, 582 F.Supp. 804, 807 n. 3 (S.D.N.Y.1984). Our Court of Appeals has considered the Pennsylvania law of prejudgment interest on two recent occasions. *Black Gold Corp. v. Shawville Coal Co.*, 730 F.2d 941 (3d Cir.1984), addressed the award of prejudgment interest in contract actions. *Ambromovage v. United Mine Workers of America*, 726 F.2d 972 (3d Cir.1984), decided two months before *Black Gold*, considered the propriety of an award of prejudgment interest

against a union which had breached its fiduciary duty. These cases bear careful scrutiny because they come to different, although not inconsistent, results, and because *Black Gold* does not refer to or distinguish *Ambromovage*.

*Ambromovage* involved a claim that the union breached its duty to the anthracite Health and Welfare Fund by failing to collect certain royalties due the fund from certain coal operators. The district court found that the union had breached its duty, but declined to award prejudgment interest. *See Nedd v. United Mine Workers of America*, 488 F.Supp. 1208 (W.D.Pa.1980). Plaintiffs had brought both federal and state claims. The Court of Appeals held that Pennsylvania law governed the award of prejudgment interest on claims governed by Pennsylvania law, and that federal law governed the award of prejudgment interest on federal claims. 726 F.2d at 981 n. 25. However, the court "perceive[d] only one legal right under either Pennsylvania or federal law." 726 F.2d at 981. The court saw "no difference between the federal and state rules...." 726 F.2d at 981 n. 25. Those rules, the Court of Appeals concluded, permit, but do not require, the award of prejudgment interest. "We think it is clear, under *Sack [v. Feinman*, 489 Pa. 152, 413 A.2d 1059 (1980)], that 'prejudgment interest' awards in Pennsylvania are discretionary with the trial court." 726 F.2d at 981.

■ *Black Gold* involved a dispute over the contract price of coal. The Court of Appeals held that because Pennsylvania law governed the underlying claim, it also governed the award of prejudgment interest. 730 F.2d at 943. Pennsylvania had adopted Restatement (Second) of Contracts § 347(a) concerning awards of prejudgment interest in contract actions. 730 F.2d at 943. The Court of Appeals interpreted the general Pennsylvania "contract prejudgment interest rule [as] an extension of the common law rule that allowed damages for delay as such but only where *liquidated* sums were involved. Thus, under Pennsylvania law, for prejudgment interest to be awarded the underlying debt must be liquidated as that term has come to be defined by Pennsylvania law." *Id.* (original emphasis; footnote omitted). "Recovery of prejudgment interest under this standard is a matter of law, not discretion." *Id.; see also Liberty Mutual Insurance Co. v. Home Insurance Co.*, 583 F.Supp. 849, 856 (W.D.Pa.1984).

■ A court has discretion to award or not award prejudgment interest on some claims, but must or must not award prejudgment interest on others. *See American Enka Co. v. Wicaco Machine Corp.*, 686 F.2d 1050, 1056–1058 (3d Cir.1982); *compare Gold & Co., Inc. v. Northeast Theater Corp.*, 281 Pa.Super. 69, 421 A.2d 1151 (1980) (no discretion not to award interest on contract claim), *with Sack v. Feinman*, 489 Pa. 152, 413 A.2d 1059 (1980) (award discretionary in suit for conversion of trust assets). Pennsylvania law seems to mandate an award of interest on the claims of Mamiye, Horizon, Brown, and Pak-Mor in this case.

The four attaching creditors who may recover in this action have been forced to litigate their entitlements in a peculiar forum. However, their claims have precisely the same nature as a claim by an attaching creditor against a garnishee in a Pennsylvania court of common pleas. The Pennsylvania attachment rules provide that

> if the court enters judgment for the plaintiff [, i.e. the attaching creditor,] and against the garnishee upon pleadings or after trial, the judgment shall be for the property of the defendant found to be in the garnishee's possession, but no money judgment entered against the garnishee shall exceed the amount of the judgment of the plaintiff against the defendant [, i.e. the attaching creditor's debtor,] together with interest and costs.

Pa.R.Civ.P. 3147 (Purdon Supp.1983); *see also* Pa.R.Civ.P. 3146 (Purdon Supp.1983) (content of judgment by default against garnishee). A judgment obtained by any of the four prevailing attaching creditors against Fidelity, if obtained in a court of common pleas to enforce the creditor's writ

of execution, would have been in an amount up to Commonwealth's property in Fidelity's hands, but not exceeding the amount of the creditor's judgment "together with interest and costs."

If Rule 3147's reference to "interest and costs" refers to interest on the original judgment, then Rule 3147 suggests that a Pennsylvania court will always award that interest in an action against a garnishee upon a writ of execution. Applied in this context, if Rule 3147 refers to "interest" on the Mamiye, Horizon, Brown, and Pak-Mor state court judgments against Commonwealth, then Rule 3147 suggests that had any of these parties sued Fidelity in a court of common pleas to enforce its writ of execution, the court of common pleas would have awarded pre-enforcement-judgment interest in the amount of the post-original-judgment interest due.

Rule 3147 does not make clear whether "interest and costs" refers to interest on the underlying judgment or interest on the enforcement judgment. The parties have not cited any authority on this question. However, the operation of the Pennsylvania attachment rules as interpreted by the Pennsylvania courts implies that "interest and costs" means interest and costs in the original action and not interest and costs in the enforcement action. This in turn implies that the Pennsylvania attachment rules mandates an award of prejudgment interest here.

■ Rule 3148 provides that a Rule 3147 judgment against a garnishee shall "be in the form of a money judgment if the garnishee owes a debt to the defendant." Pa. R.Civ.P. 3148(a)(1). Rule 3147 places two upper limits on the amount of this judgment. The judgment can exceed neither the amount of the debt owed by the garnishee to the debtor nor the amount of the attaching creditor's judgment against the debtor "together with interest and costs." "Rule 3147 protects the garnishee who [sic] defends itself against claims in excess of the assets held." *Voorhis v. Voorhis*, 26 Pa.D. & C.3d 596, 599 (Pa.C.P., Erie County, 1980); *see also Queen City Electrical*

*Supply Co., Inc. v. Soltis Electric Co., Inc.*, 491 Pa. 354, 421 A.2d 174 (1980) (decided under Rule 3146 governing default judgments against a garnishee). Thus, on the day of judgment against him, a garnishee can be liable for no more than the amount of the debtor's property in his hands.

■ However, from the day of the judgment against the garnishee, that judgment becomes like any other at Pennsylvania law and the creditor may execute upon it. *See* Pa.R.Civ.P. 3148 (Purdon Supp. 1983). A judgment draws postjudgment interest in Pennsylvania at the "lawful rate." 42 Pa.Cons.Stat.Ann. § 8101 (Purdon 1982). Thus, a money judgment—as distinct from a judgment for a specific item of property—rendered against a garnishee for the amount of a debt owed by the garnishee to the attaching creditor's debtor would draw interest against the garnishee at the lawful rate from the time of the award under Rule 3148.

This result implies that Rule 3147's protection against judgments exceeding the amount of the creditor's judgment "together with interest and costs" extends only up until the day that judgment is rendered. After that time, the garnishee will incur liability for post-judgment interest at the lawful rate. This suggests that the Rule 3147 reference to "interest and costs" is a reference to the interest that the creditor's underlying judgment against his debtor has incurred from the time of that judgment until the time of the judgment against the garnishee. The factual recital in *Ruehl v. Maxwell Steel Co., Inc.*, 474 A.2d 1162 (Pa.Super.1984), supports this view. The attaching creditor in *Ruehl* confessed judgment on a note for $19,386.69. Later that month it attempted to obtain judgment against a garnishee for $19,470.24 under Rule 3146. The higher amount represented the original judgment plus interest and costs since the time of the original judgment's entry. 474 A.2d at 1162–1163.

■ Rule 3147, then, mandates an award of prejudgment interest in this case.

I must award interest on the judgments against Commonwealth of Mamiye, Horizon, Brown and Pak-Mor from the time they were rendered until the time that Fidelity satisfied its obligations to these attaching creditors. This interest will run at the "lawful rate." 42 Pa.Cons.Stat.Ann. § 8101 (Purdon 1982). This rate is the legal rate established by the states rendering the judgments. *Cf. East Coast Management, Inc. v. McLaughlin,* 533 F.Supp. 439, 444 (E.D.Pa.1982). All four attaching creditors have state court judgments which bear simple interest at nine percent per annum. *Fidelity Bank,* 581 F.Supp. at 1021 n. 12.

A question now arises as to the period over which Rule 3147 requires interest to be paid. For interest purposes, a federal interpleader court treats the interpleading party as having satisfied its obligation to the successful claimants as of the date that the interpleading party deposits the interpleaded fund in court. Thus, the interpleading party bears no liability for interest on the interpleaded fund after the date that he pays the interpleaded fund into court. *See, e.g., Provident Indemnity Life Insurance Co. v. Durbin,* 541 F.Supp. 4, 9 n. 4 (E.D.Pa.1981). As of that time, the interpleader court will treat the fund, for interest purposes, as if it belonged to the parties who ultimately prevail. In fact, the Supreme Court has held that if a state statute authorizes the state to appropriate the interest earned on a fund deposited in court, that appropriation amounts to a taking of property *from the successful claimants* without due process of law. *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 162–164, 101 S.Ct. 446, 451–452, 66 L.Ed.2d 358 (1980).

Rule 3147, then, imposes no obligation upon Fidelity to pay post-state-judgment interest to an attaching creditor after the date that Fidelity paid the interpleaded fund into court. If Rule 3147 does not mandate the payment of interest from the fund at any particular rate, this court must exercise its discretion as to whether to award interest, and if so, at what rate.

"The usual and general rule [after the date the fund is paid into court] is that any interest on the interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." *Webb's Fabulous Pharmacies,* 449 U.S. at 162, 101 S.Ct. at 451. That rule even applies when the interpleading party posts a bond; the successful claimant may recover the income earned by the interpleading party on the retained fund during the pendency of the interpleader action. *Unigard Mutual Insurance Co. v. Abbott,* 732 F.2d 1414, 1418–1419 (9th Cir.1984); *Amoco Transport Co. v. Dietze, Inc.,* 582 F.Supp. 804, 806–807 (S.D.N.Y.1984); *see also Gelfgren v. Republic National Life Insurance Co.,* 680 F.2d 79, 82 (9th Cir.1982) (rule interpleader).

These cases suggest that a federal court, exercising discretion under either federal or state law, will award the actual income earned on an interpleaded fund during the pendency of the action to the successful claimants. The parties have not cited authority for the proposition that a Pennsylvania court would not exercise discretion in exactly this manner. I will therefore adopt the *Webb's* rule.

These principles suggest that a claimant in this action should receive an amount from the fund interpleaded into court which consists of three components. The first component is the face amount of the state court judgment that the claimant recovered against Commonwealth. The second component consists of the post-state-judgment interest due on that judgment as of April 29, 1983, the date this action commenced. Finally, a successful claimant is entitled to the income actually earned by the interpleaded fund from April 29, 1983, until the time of payment on the sum of the first and second components of the claimant's recovery. In the case of Mamiye and Pak-Mor, one should note, the second component of their recoveries is not available to them. The principal amounts of their state court judgments exceed the amount of the interpleaded fund that was

subject to their writs of execution on April 29, 1983. Therefore, Mamiye and Pak-Mor will receive only a portion of the first component of their recovery, and then the actual income earned by the interpleaded fund on that portion of the first component.

On the present record, the court cannot grant summary judgment for precise amounts to each of the four successful claimants. Material issues of fact remain as to the amount of Mamiye's entitlement, if any, and the amounts of the other parties' interest and income entitlements. While parties may develop a record amenable to summary judgment on these issues, or the parties may even amicably resolve these factual questions, the court cannot

grant further summary judgment on the record before it.[5]

### 3. *Fidelity's Petition for Attorneys' Fees*

Fidelity has moved for an Order declaring its entitlement to reasonable attorneys' fees incurred in this action, this amount to be awarded from the interpleaded fund. Fidelity invokes what it contends is a general principal that a disinterested stakeholder may, in federal court, obtain reasonable costs and attorneys' fees from the fund. *See, e.g., Amoco Transport Co. v. Dietze*, 582 F.Supp. 804, 805 n. 1 (S.D.N.Y.1984); 3A J. Moore and J. Lucas, *Moore's Federal Practice* ¶ 22.16[2] (2d ed. 1982). Fidelity does not make this claim directly under the Trust Agreement.[6]

---

5. Mamiye's entitlement is contingent on its successful defense against the Commonwealth and Pak-Mor attacks on Mamiye's New York judgment. In any event, the amount of Mamiye's principal entitlement remains uncertain; the present record does not disclose the amount of the interpleaded fund not impressed with Commonwealth's trust on April 29, 1984. Therefore, Mamiye's entitlement to income must also remain uncertain.

Horizon has received payments of $32,080 on March 7, 1984, and $51,000 on March 14, 1984. These two payments satisfy Horizon's entitlement to payment of the principal amount of its New York judgment from the interpleaded fund. Horizon's judgment is dated March 15, 1983. Horizon is therefore entitled to nine percent per annum simple interest on $83,080 from March 15 until April 29, 1983. Interest at nine percent per annum for forty-five days on $83,-080 amounts to $921.85. In addition, Horizon is entitled to the income earned on $84,001.85 of the interpleaded fund, the total amount of its entitlement as of April 29, 1983, from April 29, 1983, until the time that Horizon received or will receive payment. The present record does not permit accurate calculation of Horizon's income entitlement. The parties, with the aid of the Clerk's Office, will have to develop the record further.

Brown, like Horizon, has received payment of the principal amount of his Texas judgment, $117,066.02, on March 14, 1984. Brown, like Horizon, has not received payment of his interest entitlement. Brown's obtained his Texas judgment on March 15, 1983. Nine percent per annum simple interest on $117,066.02 for the forty-five days from March 15 until April 29, 1983, amounts to $1,964.71. Brown is entitled to payment of this amount and to payment of the income earned on his April 29, 1983, entitlement of $119,030.73, between April 29, 1983,

and the dates that Brown received or will receive actual payment.

Pak-Mor's principal and income entitlements remain uncertain because Mamiye's principal entitlement remains undetermined. Pak-Mor, of course, receives any amounts to which neither Mamiye, nor Horizon, nor Brown has an entitlement.

6. Article II, paragraph First of the Trust Agreement provides "that the Trust Fund shall also be available (in priority to the aforementioned payments [to American policyholders] ) for the payment of any and all expenses properly incurred by the Trustee in connection with the administration of the Trust." *Fidelity Bank*, 581 F.Supp. at 1023-1024. Article III, paragraph Fifth more specifically provides that the "fee of the Trustee and all reasonable expenses of the Trustee and counsel fees and other disbursements incurred in and about the administration of the said Trust shall be a first lien against the Trust Fund." 581 F.Supp. at 1027.

Fidelity did not assert a claim under these provisions in the initial stages of this action. Fidelity did not file a motion for summary judgment by August 29, 1983, as required by this court's Order of August 1, 1983. *See Fidelity Bank*, 581 F.Supp. at 1002. Fidelity has therefore waived any claim that it might have had under the Trust Agreement to the interpleaded fund. Of course, had Fidelity raised a claim under the Trust Agreement, Fidelity could not also raise an equitable claim for attorneys' fees as a disinterested stakeholder.

The existence of article II, paragraph First and article III, paragraph Fifth do not buttress Fidelity's equitable claim for attorneys' fees. It is not entirely clear that Fidelity could have demonstrated a priority for its attorneys' fees claim arising out of expenses in this litigation. Fidelity would have to have demonstrated that the "first lien" language acted to relieve assets

■ Although other aspects of this action are governed by the law of Pennsylvania, federal courts in interpleader apply federal common law to the question whether the interpleader party may recover attorneys' fees from the interpleaded fund. *Mutual of Omaha Insurance Co. v. Dolby*, 531 F.Supp. 511, 516 n. 4 (E.D.Pa.1982); 3A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 22.16[2] at 22–180 to 22–181 (2d ed. 1982). "The priority of a counsel fee award ... is committed to the sound discretion of the trial court which considers what is 'appropriate' under the circumstances." *Brose v. International Fidelity Insurance Co.*, 547 F.Supp. 149, 151 (E.D.Pa.1982) (quoting *Dolby*, 531 F.Supp. at 516); *accord J.A. Jones Construction Co. v. Southern Stress Wire Corp.*, 575 F.Supp. 365, 369 (N.D.Ga.1982).

■ When a stakeholder has used the court to aid it in making a decision which is an ordinary one in the course of the stakeholder's business, an award of attorneys' fees is not appropriate in the circumstances. Such an award would constitute a shifting of some of the stakeholder's ordinary business expenses to the claimants. *Dolby*, 531 F.Supp. at 517; *Companion Life Insurance Co. v. Schaffer*, 442 F.Supp. 826, 830 (S.D.N.Y.1977); *Travelers Indemnity Co. v. Israel*, 354 F.2d 488, 490 (2d Cir.1965).

*Dolby, Schaffer,* and *Israel* all involved multiple claimants to insurance benefits. All three courts held that insurance companies routinely must determine who, if anyone, may recover from them. The institution of an interpleader action merely enlists the aid of the court in making this routine determination.

■ I find this action falls within the category of disputes in the ordinary course of the stakeholder's business. In establishing a trust with Fidelity, Commonwealth sought to provide "security for its American insureds and reinsureds whose claims may be payable in U.S.A. currency." Trust Agreement Preamble, 581 F.Supp. at 1023.

This security would only come into use in the event that Commonwealth had ceased to pay claims as they became due and, in addition, in the event that Commonwealth had ceased to satisfy judgments entered against it in courts of competent jurisdiction. In effect, the Trust Agreement was designed to provide security against the sort of collapse of Commonwealth which has actually occurred.

In anticipation of such a collapse, Commonwealth established a trust with a professional fiduciary. *See* Trust Agreement, art. III, ¶ 9, 581 F.Supp. at 1027. That fiduciary had responsibility for administering the trust's assets and also for making payments from the trust's assets to proper claimants. No party disputes that Fidelity is a professional fiduciary used to occupying positions similar to that which it held under Commonwealth's Trust Agreement.

When Commonwealth actually collapsed, Fidelity found itself faced with claims aggregating more than the trust's assets. The collapse for which Commonwealth and Fidelity had entered into the Trust Agreement necessitated decisions as to who would receive payment for the Trust Fund. These were precisely the decisions that the Trust Agreement anticipated that Fidelity would have to make in the event of Commonwealth's collapse. Fidelity felt incapable or unwilling to make such decisions and face subsequent litigation. Fidelity therefore interpleaded the Trust Fund and its accumulated income. Nevertheless, the decisions that Fidelity asked the court to make in this litigation were decisions that formed an ordinary part of Fidelity's business as fiduciary. They constituted precisely the decisions which Fidelity was hired to make in the event that Commonwealth ceased satisfying claims against it. Therefore, Fidelity is not entitled to attorneys' fees from the interpleaded fund.

### 4. *Motion for Judgment on the Pleadings on Horizon's Counterclaim*

Horizon, one of the successful claimants, has brought a counterclaim against Fidelity

from prior attachments by the four successful claimants because Fidelity did not incur its litigation expenses until after Horizon, Brown, and Pak-Mor attached all of the Trust Fund.

for the costs that Horizon incurred in litigating this interpleader action. Fidelity has moved for judgment on the pleadings against Horizon. Insofar as Horizon can establish that Fidelity acted in bad faith or in reckless disregard for Horizon's interests, Fidelity's motion must be denied.

As described more fully in my original Opinion in this matter, Horizon suffered a loss compensable under its policy with Commonwealth. *See Fidelity Bank*, 581 F.Supp. at 1006. Horizon then engaged in settlement discussions with Commonwealth. Amended Counterclaim ¶ 49. Horizon alleges that on January 7, 1983, in the course of its discussions with Fidelity, Horizon's counsel telephoned "associate counsel for Fidelity to discover the nature of Commonwealth Marine's account at Fidelity. During this conversation, counsel for Horizon [allegedly] informed Fidelity's associate counsel that Horizon had a claim against Commonwealth Marine for a loss covered by the policy." Amended Counterclaim ¶ 49.

Horizon's counterclaim next alleges that Fidelity's counsel either actively misrepresented the terms of the Trust Agreement or at least failed adequately to inform Horizon of the prerequisites to payment out of the Trust Agreement:

> During the phone conversation referred to in paragraphs 49 and 50 above, counsel for Horizon asked how Horizon could satisfy its claim out of the proceeds of the Trust Account. In response, Fidelity's associate counsel stated only that Horizon would have to obtain a judgment and proceed through normal channels to obtain funds from the account. At no time during this phone conversation, did associate counsel for Fidelity inform Horizon's counsel of (a) the existence of the Trust Agreement, (b) the methods prescribed thereunder for satisfaction of claims or (c) Fidelity's position that the

Trust Account was not subject to attachment by garnishment.

Amended Counterclaim ¶ 51.[7]

Horizon claims that it relied upon Fidelity's counsel's alleged representation that Horizon could satisfy its claim from the Trust Fund if it obtained a judgment and proceeded "through normal channels." Amended Counterclaim ¶ 52. Horizon entered into an Affidavit of Settlement with Commonwealth on January 24, 1983, assertedly in reliance upon Fidelity's counsel's statements. *Id.; see also* Amended Counterclaim exh. A–1.

Fidelity contends that Horizon has not stated a viable counterclaim for three reasons. First, Fidelity contends that it would have breached no duty to Horizon had Fidelity actually failed to provide information to Horizon. Second, Fidelity contends that even if it breached a duty, the Trust Agreement insulates Fidelity from liability to Horizon for that breach. Third, Fidelity contends that if it breached a duty for which it might have been liable, Horizon has suffered no legally cognizable injury as a result of the breach.

Fidelity's arguments on the first and second points rest heavily on the third paragraph of article II of the Trust Agreement. That paragraph provides:

> No holder of an American policy shall be entitled at any time to charge the Trustee in respect of any assets other than the assets actually constituting the Trust Fund at the time his claim becomes enforceable as hereinbefore defined. Nor shall any policyholder of an American policy (even after his claim becomes enforceable as hereinbefore defined) be entitled to require from the Trustee any account or otherwise to inquire into the course of the administration of the Trust or to question any act or thing done or suffered by the Trustee, or otherwise to

---

7. Horizon first identified "associate counsel" as Carol Ballentine, Esq., in its response to Fidelity's motion for judgment on the pleadings. Memorandum in Opposition to Plaintiff's Motion for Judgment on the Pleadings at 4. Ms. Ballentine appeared on both Fidelity's reply to Horizon's amended counterclaim and Fidelity's motion for judgment on the pleadings, both filed before Horizon's identification of "associate counsel." Neither party has discussed the import of Disciplinary Rule 5–102 in this situation, so I do not consider it.

enforce the Trust, the sole right under this Agreement of any policyholder being to receive the amount of his claim after it has become enforceable, as hereinbefore defined, from the assets then actually constituting the Trust Fund and available for such payment as provided under the Agreement.

*Fidelity Bank*, 581 F.Supp. at 1024.

Paragraph Third appears to limit Fidelity's duty to provide information because no policyholder "shall ... be entitled to require from the Trustee any account or otherwise to inquire into the course of the administration of the Trust ...." Moreover, this paragraph appears to limit Fidelity's liability for breaches of any duty. Policyholders may not question Fidelity's actions nor may they enforce the trust. Moreover, Fidelity's liability may extend no further, under this paragraph, than the amount of the Trust Fund. To the extent that this paragraph establishes Fidelity's duty or its liability, Fidelity is entitled to judgment on the pleadings.

### a. *Duty*

Horizon's counterclaim consists of two counts. Count I states a claim for breach of a fiduciary duty. Count II states a claim for negligent breach of duty of ordinary care. Count I's viability depends upon the existence of a fiduciary duty on the part of Fidelity to provide information of the sort allegedly requested by Horizon. Count II's viability depends upon the existence of some duty outside the law of trusts imposing liability upon an individual for a negligent misstatement.

■ I need not inquire into whether the third paragraph of article II limits Fidelity's duties to Horizon unless, absent that paragraph, Fidelity would owe some duty to Horizon. Horizon has presented no authority for the proposition that Count II of its counterclaim states a theory of liability different from Count I. Unless some special duty exists, this court is unaware of any circumstances other than those constituting fraud, misrepresentation, and negligent infliction of emotional distress in which a negligent misstatement or non-

statement will result in liability. Fidelity's only special duty to Horizon arises out of Fidelity's position as trustee of Commonwealth's trust. Apart from that position, Fidelity owed no duty of ordinary care in its provision of information to Horizon. Count II of Horizon's counterclaim does not state a claim upon which relief may be granted and Fidelity is entitled to judgment on that count on the pleadings.

■ Count I presents a different problem. If the exculpatory paragraph of article II does not apply, Pennsylvania trust law imposed a duty of accurate and complete disclosure on Fidelity. Section 173 of the Restatement (Second) of Trusts sets out this duty most succinctly. "The doctrine of disclosure set forth in Section 173 of the Restatement of Trusts (Second) was recognized and applied in the orphans' courts of this Commonwealth long before the adoption in 1935, of the original Restatement .... The section has been cited with approval [by Pennsylvania Supreme Court] on several occasions since its adoption." *In re Estate of Rosenblum*, 459 Pa. 201, 214–215 n. 6, 328 A.2d 158, 165 n. 6 (1974) (citations omitted).

Section 173 provides:

The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust.

Restatement (Second) of Trusts § 173 (1959). Under this section, Fidelity had a duty, upon Horizon's request, to provide complete and accurate information as to the steps necessary before Fidelity would satisfy a claim against Commonwealth out of the trust. Fidelity allegedly gave incomplete and misleading information in this regard.

The exculpatory paragraph of article II does not completely eliminate Fidelity's

duty under section 173. Comment c to section 173 provides:

> Although the terms of the trust may regulate the amount of information which the trustee must give and the frequency with which it must be given, the beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of the trust.

Restatement (Second) of Trusts § 173, comment c (1959).

Thus, the exculpatory paragraph of article II limited Fidelity's duty, but did not relieve Fidelity of its duty to provide information reasonably necessary to enable Horizon to enforce its rights under the Trust or to redress a breach of the trust. The exculpatory paragraph purports to limit Horizon's remedies. As described below, it cannot completely foreclose Horizon's remedies. Accordingly, Fidelity had a duty under section 173 which was not vitiated by the third paragraph of article II.

### b. *Liability*

The third paragraph of article II purposes to limit Horizon's right to enforce its entitlements under the Trust Agreement. Horizon may not, under that paragraph "enforce the Trust." However, that paragraph does reiterate a policyholder's right to receive payment from the Trust Fund in accordance with the second paragraph of article II. Under the third paragraph as a whole, then, Horizon retained the right under that paragraph to sue Fidelity to enforce its right to payment of a claim if that claim had become enforceable within the meaning of the Trust Agreement. Fidelity allegedly did not provide Horizon with this information upon Horizon's request.

Fidelity argues that, even if it had such a duty, it can have no liability to Horizon. First, under the exculpatory paragraph it cannot be liable for assets other than trust assets, and Fidelity has paid all of the trust assets into court. Second, Horizon's counterclaim does not seek to enforce Horizon's right to payment. To the contrary, Horizon's counterclaim seeks to enforce Horizon's implied right to information from Fidelity; Horizon alleges a breach of trust. The exculpatory paragraph seems to preclude such a suit.

 It is a "well settled principle that no exculpatory provision in a trust instrument can permit a trustee to act in bad faith: Restatement, Trusts, Section 222(2)." *Gouley v. Land Title Bank and Trust Co.*, 329 Pa. 465, 471, 198 A. 7, 9 (1938). An exculpatory provision becomes "inapplicable if it would allow a fiduciary who acted in bad faith or with reckless indifference to the beneficiary's interests to escape liability." *In re Estate of Niessen*, 489 Pa. 135, 140, 413 A.2d 1050, 1052 (1980) (citing *Gouley* and Restatement (Second) of Trusts § 222(2) (1950). Accordingly, the third paragraph of article II cannot be applied to permit Fidelity to escape liability for a bad faith, intentional, or recklessly indifferent breach of its duty to disclose information to Horizon. Count I of the counterclaim adequately alleges such a failure to disclose. Therefore, if Horizon has alleged that it suffered a legally cognizable injury, Fidelity's motion must be denied.

### c. *Injury*

 Fidelity contends that Horizon has suffered no legally cognizable injury. Fidelity contends that Horizon has simply incurred costs in asserting its rights, a cost not compensable as damages flowing from a breach of trust.

Horizon claims that had Fidelity disclosed the existence of the Trust Agreement, its terms, and Fidelity's position on garnishment of the Trust Fund, Horizon would not have settled with Commonwealth in New York on the terms contained in the Affidavit of Settlement. Horizon contends that it would have arranged matters with Commonwealth so as to have satisfied Fidelity quickly as to the enforceability of Horizon's claim under the Trust Agreement. Such an alternative arrangement would, in Horizon's view, have resulted in immediate payment from the Trust Fund

and obviated Horizon's participation in this interpleader action. So stated, Horizon's costs incurred in this action and the difference between prejudgment interest awarded here and the actual cost to Horizon of the loss of the use of the funds eventually awarded here form cognizable damages in this suit for breach of fiduciary duty.

For these reasons, the accompanying Order denies Fidelity's motion for judgment on the pleadings as to Count I of Horizon's amended counterclaim.

### ORDER

For the reasons stated in the accompanying Opinion:

1. Maurice L. Jackson's motion for reconsideration of this court's Opinion and Order of February 24, 1984, is DENIED.

2. (a) J.E. Mamiye & Son's motion for summary judgment as to an award of interest from the interpleaded fund is GRANTED IN PART. In the event that Mamiye's contingent claim against the interpleaded fund becomes enforceable, Mamiye shall recover the amount of the interpleaded fund not impressed with Commonwealth Marine & General Assurance Company, Ltd's trust on April 29, 1983. In addition, Mamiye shall recover, if it recovers at all, the income actually earned, between April 29, 1983, and the date of payment, by the amount of the interpleaded fund's principal to which Mamiye is entitled.

(b) Horizon Medical Administrators, Inc.'s motion for summary judgment as to an award of interest from the interpleaded fund is GRANTED IN PART. Horizon is entitled to an award of nine percent per annum simple interest on its judgment of $83,080 for the 45 days from March 15, 1983 (the date of the judgment) until April 29, 1983, or $921.85. In addition, Horizon is entitled to payment of the actual income earned by $32,080 of the interpleaded fund between April 29, 1983, and March 7, 1984 (the date Horizon received this amount). Horizon is also entitled to payment of the actual income earned on $51,000 of the interpleaded fund between April 29, 1983,

and March 14, 1984 (the date Horizon received this amount). Finally, Horizon is entitled to payment of the actual income earned on $921.85 of the interpleaded fund between April 29, 1983, and the date that Horizon receives payment of the $921.85.

(c) G.A. Brown's motion for summary judgment as to an award of interest from the interpleaded fund is GRANTED IN PART. Brown is entitled to an award of nine percent per annum simple interest on its judgment of $117,066.02 for the 45 days from March 15, 1983 (the date of the judgment) until April 29, 1983, or $1,964.71. In addition, Brown is entitled to payment of the actual income earned by $117,066.02 of the interpleaded fund between April 29, 1983, and the date that Brown received payment of that amount, March 14, 1984. Finally, Brown is entitled to payment of the actual income earned upon $1,964.71 of the interpleaded fund between April 29, 1983, and the date that Brown receives payment of this amount.

(d) Pak-Mor Manufacturing Company's motion for summary judgment as to an award of interest from the interpleaded fund is GRANTED IN PART. Pak-Mor is entitled to payment of that portion of the fund interpleaded on April 29, 1983, which no other claimant is entitled to receive. In addition, Pak-Mor is entitled to payment of the income actually earned on that portion of the interpleaded fund between April 29, 1983, and the date that Pak-Mor receives payment of that amount.

(e) J.E. Mamiye & Sons, Inc., Horizon Medical Administrators, Inc., G.A. Brown, and Pak-Mor Manufacturing Company SHALL, within twenty days of the date of this Order, submit a joint statement of the amounts due to Horizon and Brown. In the event that the parties cannot agree they SHALL submit a statement of those amounts to which they do agree and a statement of their disagreements and the reasons for any such disagreements.

3. Fidelity Bank's petition for attorneys' fees is DENIED.

4. Fidelity Bank's petition for discharge against all claimants as to its liability on the interpleaded fund is GRANTED.

5. Fidelity Bank's motion for judgment on the pleadings on Maurice L. Jackson's and Horizon Medical Administrator, Inc.'s counterclaims is GRANTED IN PART AND DENIED IN PART.

(a) Fidelity's motion for judgment on Jackson's counterclaim is DENIED AS MOOT, Jackson having withdrawn the counterclaim.

(b) Fidelity's motion for judgment on Count I of Horizon's counterclaim is DENIED.

(c) Fidelity's motion for judgment on Count II of Horizon's counterclaim is GRANTED.

6. Material issues of fact exist on this record as to J.E. Mamiye & Sons, Inc.'s claim on the interpleaded fund and as to Horizon Medical Administrators, Inc.'s counterclaim. No party has demanded a jury trial on these claims. In order to prepare these claims for trial it is ORDERED that:

(a) Discovery on these claims shall be completed by September 17, 1984.

(b) Mamiye shall submit a pretrial memorandum on its claim against the interpleaded fund by September 24, 1984.

(c) Pak-Mor Manufacturing Company shall submit a pretrial memorandum on Mamiye's claim against the interpleaded fund by October 1, 1984.

(d) Horizon shall submit a pretrial memorandum on its counterclaim by September 24, 1984.

(e) Fidelity Bank shall submit a pretrial memorandum on Horizon's counterclaim by October 1, 1984.

(f) The parties shall be prepared for a conference to follow submission of pretrial memoranda.

(g) This matter is REFERRED to Magistrate William F. Hall, Jr., for any settlement discussions that the parties and Magistrate Hall deem appropriate.